IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 20-cv-02541-PAB-STV

MICHELE DOMINICA RODRIGUEZ, an individual,

     Plaintiff,

v.

POLICE OFFICER WAYLON LOLOTAI, in his official capacity,
POLICE OFFICER HER, in his official capacity,
JOHN DOE PARAMEDICS,
JOHN DOE PARAMEDICS' EMPLOYER, and
CITY OF BOULDER, COLORADO, a municipality

     Defendants.

---

## ORDER

---

This matter is before the Court on the Combined Motion for Summary Judgment on Behalf of Officers Lolotai, Her, and the City of Boulder [Docket No. 23]. Plaintiff responded, Docket No. 26,[1] to which defendants replied. Docket No. 29. The Court

---

[1] Plaintiff's response does not comply with the Court's practice standards. *See* Practice Standards (Civil cases), Chief Judge Philip A. Brimmer § III.F.3.b.iv ("Any party opposing the motion for summary judgment shall, in a section of the brief required by Rule 56.1(a) of the United States District Court for the District of Colorado Local Rules of Practice (Civil) styled 'Response to Statement of Undisputed Material Facts,' admit or deny the asserted material facts set forth by the movant. The admission or denial shall be made in separate paragraphs numbered to correspond to movant's paragraph numbering. Any denial shall be accompanied by a **brief** factual explanation of the reason(s) for the denial and a **specific reference** to material in the record supporting the denial."). Because plaintiff has failed to comply with the Court's practice standards, the Court deems admitted certain facts in defendants' motion that plaintiff has not responded to. *Id.* § III.F.3.b.ix ("Failure to follow these procedures may result in an order striking or denying the motion or brief or may cause the Court to deem certain facts as admitted.").

has jurisdiction pursuant to 28 U.S.C. § 1331.

## I.  BACKGROUND[2]

Boulder parks are closed between 11:00 p.m. and 5:00 p.m., and remaining in a

park between those hours is a violation of Boulder Municipal Code § 8-3-3(b).  Docket

No. 23 at 2, ¶ 2.  Officers Waylon Lolotai ("Lolotai") and Fue Her ("Her" and, collectively

with Officer Lolotai, the "defendant officers" or the "officers") were on routine foot patrol

on August 25, 2018 along the Boulder Creek path at approximately 11:40 p.m.  *Id.*, ¶ 1.

The officers heard a disturbance across Broadway in Sister Cities Plaza, which is a

park covered by the 11:00 p.m. closure rule.  *Id.*, ¶¶ 3–4.[3]  Upon arriving at the plaza,

the officers encountered five individuals sitting and standing, along with several open

containers, including one behind and within easy reach of plaintiff.  *Id.* at 2–3, ¶¶ 3–6.[4]

_____

[2] The following facts are undisputed unless otherwise noted.

[3] Plaintiff states in her response that "[t]here is nothing in the record indicating defendants Lolotai and Her approached [plaintiff] or anyone else because they were in a park after 11:00 p.m." or that the officers even knew about the "curfew" or that the area was a city park.  Docket No. 26 at 2.  Plaintiff, however, does not dispute that the officers heard a disturbance in Sister Cities Plaza and went to investigate, and she does not provide a "**specific reference** to material in the record" that could support her belief that the officers did not know of the curfew.  *See* Practice Standards (Civil cases), Chief Judge Philip A. Brimmer § III.F.3.b.iv.  Plaintiff also states that the officers lied about hearing the disturbance in order to "cover up the real reason for approaching the group: harassing houseless citizens" and that the officers were watching the group "looking for any possible excuse to approach and harass them."  Docket No. 26 at 6–7.  However, plaintiff again fails to provide a specific reference to the record that could support this denial.  Moreover, the evidence cited by defendants, *i.e.*, Officer Her's body worn camera footage, shows one of the individuals explaining that there were "words" exchanged because someone stole a bicycle, which supports defendants' indication that they heard a commotion from across the street.  *See* Docket No. 25, (Ex. C) (Her) AXON_Body_2_Video_2018-08-25_2338, at 5:40:02–20.

[4] Plaintiff purports to dispute this fact by stating that there is no evidence that plaintiff "ever actually or constructively possessed and drank from an open alcoholic

Possession of an open container of alcohol is a violation of Boulder Municipal Code § 5-7-2. *Id.* at 3, ¶ 11.

The officers asked the individuals to be seated. *Id.*, ¶ 8. Plaintiff objected and asked the officers if they had a warrant. *Id.*, ¶ 9.[5] Officer Lolotai responded that there were open containers of alcohol around plaintiff and the others, *id.*, ¶¶ 10, 12, and, after plaintiff denied this, Officer Lolotai illuminated the area with his flashlight, which showed an open container immediately behind plaintiff. *Id.*, ¶ 13.

Officer Lolotai asked plaintiff to sit down 11 times and explained that he asked everyone to sit down for his safety. *Id.*, ¶¶ 14, 16. Plaintiff sat down briefly, and Officer Lolotai asked plaintiff for her identification and informed her that she was being detained. *Id.* at 4, ¶¶ 17, 19. After providing her date of birth, plaintiff stood. *Id.*, ¶ 20. Officer Lolotai again asked plaintiff to sit down and told her that if she did not sit, he was going to place her in handcuffs. *Id.*, ¶ 21. Plaintiff sat down and reached into a bag that was on the bench next to her. *Id.*, ¶ 22. Officer Lolotai asked plaintiff to stop digging in her bag. *Id.*, ¶ 23. Plaintiff stood up and asked where her phone was. *Id.*, ¶ 24. After Officer Her told plaintiff to "[s]top reaching for stuff," she tossed her phone

---

beverage." Docket No. 26 at 2. Plaintiff does not, however, dispute that there were open containers behind and within easy reach of plaintiff.

[5] In support of this fact, defendants cite to Officer Lolotai's body worn camera footage, which they filed as "Exhibit B." *Id.*; *see also id.* at 2, ¶ 3. The footage provided to the Court, however, is a roughly two minute video of Officer Lolotai talking with plaintiff in what appears to be a hospital room, asking if she would sign a ticket and providing her with her court date. Defendants have provided no footage from Officer Lolotai's body worn camera during the officers' interaction with plaintiff in the park.

into her bag and reached into her bag again. *Id.*, ¶¶ 25–26.[6]  The officers put plaintiff in handcuffs, while plaintiff resisted the officers. *Id.*, ¶¶ 27–28.[7]  Plaintiff continued to resist as the officers "bent Plaintiff over at the waist and placed her face on a bag" on the ground. *Id.* at 5, ¶¶ 29–30.[8]  Plaintiff was bent over for 62 seconds before the officers backed away and allowed her to move about while repeatedly asking her to sit down. *Id.*, ¶¶ 31–32.[9]

---

[6] Plaintiff disputes defendants' characterization that she "reached into her bag three times or pockets." Docket No. 26 at 9. Plaintiff, however, provides no specific reference to the record that could support her denial. Moreover, Officer Her's body worn camera footage shows plaintiff reaching into her bag at least twice and her pockets at least once. *See* Docket No. 25, (Ex. C) (Her) AXON_Body_2_Video_2018 -08-25_2338, at 5:40:55–41:09.

[7] Plaintiff disputes whether there was probable cause to arrest her for obstructing a peace officer because a jury acquitted her of this charge at her criminal trial. Docket No. 26 at 3 (citing Docket No. 1 at 13, ¶ 35). The Court will not address plaintiff's legal argument in this section. *See* Practice Standards (Civil cases), Chief Judge Philip A. Brimmer § III.F.3.b.vii. She also states that she did not obstruct the officers because Officer Lolotai called plaintiff by her name, which "contradict[s] the defense's claim that Michele refused to identify herself." Docket No. 26 at 4. The Court finds no genuine dispute as to this fact because defendants do not allege that plaintiff's obstruction was only because she did not provide officers her name. Finally, she contends that she was handcuffed because she said, "I'm gonna call your sergeant," rather than because she was reaching into her bag or did not sit when ordered to. *Id.* at 9. Plaintiff, however, provides no "**specific reference** to material in the record" that could support this statement. *See* Practice Standards (Civil cases), Chief Judge Philip A. Brimmer § III.F.3.b.iv. Moreover, the officers' motivation is irrelevant to whether they had reasonable suspicion or probable cause.

[8] Plaintiff disputes whether a bag on the ground served as a cushion. Docket No. 26 at 15. Plaintiff does not, however, dispute that, after plaintiff was bent over, her face was on a bag.

[9] Plaintiff states that "disputed material facts exist as to the reasonableness of Loloti [sic] and Her's use of force" because "Lolotai knows [plaintiff], has never known her to be violent or possess weapons and when forced into restraints she had not reached into her bag three times or her pockets as alleged by the defense." Docket No. 26 at 8–9. Plaintiff provides no "**specific reference** to material in the record" that could

When the officers searched plaintiff, they found that she had a knife in her pocket, in violation of Boulder Municipal Code § 5-8-9, and that there was a hatchet under a bag near where plaintiff was sitting. *Id.*, ¶¶ 33–34. The officers told plaintiff that she was going to be placed in a police car. *Id.*, ¶ 35. Plaintiff resisted the officers, and they used minimal force to obtain compliance. *Id.*, ¶ 36–37. Non-party officers decided to transport plaintiff via ambulance to Boulder Community Hospital. *Id.* at 6, ¶ 40. Over an officer's objections, paramedics, who are not employed by the City of Boulder (the "City"), administered Haldol to plaintiff so that she could be transported safely. *Id.*, ¶¶ 41–42; Docket No. 25, (Ex. E) (Ekwo) AXON_Body_2_Video_2018-08-25_2345, at 5:55:22–41. Neither of the defendant officers participated in the decision to use Haldol, and neither was present when the drug was administered. *Id.*, ¶ 43. Plaintiff did not file a notice of claim with the City. *Id.*, ¶ 46.

Plaintiff brings the following five claims for relief: (1) Fourth Amendment unconstitutional seizure against the defendant officers; (2) Fourth Amendment excessive force against the defendant officers, the paramedics, and their employer; (3) First Amendment retaliation and suppression of speech and association against the defendant officers; (4) negligent hiring, failure to supervise, and failure to train against the City; (5) and unconstitutional policy, practices, and customs against the City. Docket No. 1 at 14–22, ¶¶ 41–89.

---

support her denial. *See* Practice Standards (Civil cases), Chief Judge Philip A. Brimmer § III.F.3.b.iv. In reply, defendants state that the video evidence "plainly depicts" plaintiff reaching into her bag three times, but defendants argue that the fact is not material. Docket No. 29 at 3. Whether plaintiff reached into her bag two or three times is not material to defendants' motion.

## II.  LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248–50 (1986).  A disputed fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231–32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quotation omitted).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotations omitted).  "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case."  *Bausman*, 252 F.3d at 1115.  When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  *Id.*

### B.  Qualified Immunity

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  A court should resolve questions of qualified immunity at the earliest possible stage of litigation.  *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987).  However, a plaintiff facing a qualified immunity challenge still does not have a heightened pleading standard.  *Currier v. Doran*, 242 F.3d 905, 916-17 (10th Cir. 2001).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Thus, to survive a motion to dismiss under Rule 12(b)(6) "where a qualified immunity defense is implicated, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights.'"  *Hale v. Duvall*, 268 F. Supp. 3d 1161, 1164 (D. Colo. 2017) (quoting *Robbins*

*v. Oklahoma ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1249 (10th Cir. 2008)). When a defendant raises the defense of qualified immunity, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct."  *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (internal quotation marks omitted).

Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case." *Pearson*, 555 U.S. at 236.  The practical effect of *Pearson's* directive on the qualified-immunity analysis is that for a plaintiff to prevail, both prongs must be adequately established; however, for a defendant to prevail, inadequacy with respect to either prong will suffice.  *See Shroff v. Spellman*, 604 F.3d 1179, 1188 (10th Cir. 2010).

## III.  ANALYSIS

### A.  Claims against Officers Lolotai and Her

#### 1.  *Claim One – Unconstitutional Seizure*

The Court first considers plaintiff's "unconstitutional seizure" claim against the defendant officers.  Plaintiff claims that she was subject to a Fourth Amendment seizure the moment Officer Lolotai told her that she was being detained.  Docket No. 1 at 14, ¶ 44.  Plaintiff further alleges that the officers lied about a fight occurring in order to approach a group of "'transients' under false pretenses" and that Officer Lolotai could not answer why he detained plaintiff but, if he actually had reasonable suspicion, he

had to "readily" explain the reason for the detention.  *Id.* at 15, ¶¶ 45–47.  Plaintiff thus asserts that she was detained without reasonable suspicion.  *Id.*, ¶ 47.

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  A "seizure" of one's person occurs when a government actor terminates one's freedom of movement through intentional means.  *See Brower v. Cnty. of Inyo*, 489 U.S. 593, 596–97 (1989); *Scott v. Harris*, 550 U.S. 372, 381 (2007).  The Supreme Court has identified three types of police encounters with citizens: consensual encounters, investigative stops, and arrests.  *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (en banc).  Consensual encounters are not seizures under the Fourth Amendment.  *Id.*  Investigative detentions, also called *Terry* stops, after *Terry v. Ohio*, 392 U.S. 1 (1968), are seizures within the meaning of the Fourth Amendment that allow a police officer to briefly detain a person for investigative purposes.  *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. 2012).  However, the officer need only have a reasonable suspicion of criminal activity, not probable cause.  *Id.*  An arrest requires probable cause to believe that the arrestee committed a crime.  *Plascencia v. Taylor*, 514 F. App'x 711, 715 (10th Cir. 2013) (unpublished).  "An arrest is distinguished [from an investigatory stop] by the involuntary, highly intrusive nature of the encounter."  *Cortez*, 478 F.3d at 1115 (quotation omitted).

The parties state at various points that plaintiff was either detained or arrested.  *See* Docket No. 23 at 16; Docket No. 26 at 11.  The "use of firearms, handcuffs, and

9

other forceful techniques generally exceed the scope of an investigative detention and enter the realm of an arrest." *Cortez*, 478 F.3d at 1115-16 (quotation marks omitted). But this is not always the case because "even the use of handcuffs and forcing an individual to lie on the ground will not necessarily transform an investigative detention into an arrest." *See Davis v. City of Aurora*, 705 F. Supp. 2d 1243, 1257–58 (D. Colo. 2010) (citing *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993); *Novitsky v. City of Aurora*, 491 F.3d 1244, 1254 (10th Cir. 2007) ("Under certain circumstances, the steps officers may permissibly take to protect their safety include drawing their weapons, placing a suspect in handcuffs, or forcing a suspect to the ground."); *Fuchs v. Sanders*, 659 F. Supp. 2d 1136 (D. Colo. 2009)); *see also United States v. Merkley*, 988 F.2d 1062, 1064 (10th Cir. 1993); *United States v. Miller*, 974 F.2d 953, 957 (8th Cir. 1992) ("Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a *Terry* stop."). Moreover, "[w]hile *Terry* stops generally must be fairly nonintrusive, officers may take necessary steps to protect themselves if the circumstances reasonably warrant such measures." *Perdue*, 8 F.3d at 1462. As such, courts consider the degree of force used in determining whether the seizure was an investigative detention or arrest, and physical restraint is a "hallmark" factor in determining whether a *Terry* stop was actually an arrest. *Plascencia*, 514 F. App'x at 716 (citing *Morelli v. Webster*, 552 F.3d 12, 20 (1st Cir. 2009)).

Defendants contend that the distinction between detention and arrest is not material in this case because plaintiff was charged in Boulder County Court with resisting arrest and obstructing a peace officer, *see* Docket No. 23-6 at 2, ¶ 10, and that

court already determined that there was probable cause for her arrest.  Docket No. 23 at 11–12.  As such, defendants argue that this Court is bound by the state court's probable cause determination under the principles of issue preclusion.  *Id.*

### a. Issue Preclusion

"The Full Faith and Credit Act, 28 U.S.C. § 1738, requires a federal court to give the same preclusive effect to a state-court judgment that the judgment would be given in the courts of the state in which the judgment was rendered."  *Jiron v. City of Lakewood*, 392 F.3d 410, 415–16 (10th Cir. 2004) (citing *Allen v. McCurry*, 499 U.S. 90, 96 (1980)).  The preclusive effect of a state court judgment is governed by the preclusion rules of that state.  *Valley View Angus Ranch, Inc. v. Duke Energy Field Servs., Inc.*, 497 F.3d 1096, 100 (10th Cir. 2007).  "Issue preclusion bars relitigation of a legal or factual matter already decided in a prior proceeding."  *In re Tonko*, 154 P.3d 397, 405 (Colo. 2007) (footnote omitted).  It applies "regardless of whether [the earlier] case was based on the same cause of action."  *Willner v. Budig*, 848 F.2d 1032, 1034 (10th Cir. 1988).  It is a "a judicially created, equitable doctrine intended to 'relieve parties of multiple lawsuits, conserve judicial resources, and promote reliance on the judicial system by preventing inconsistent decisions.'"  *Tonko*, 154 P.3d at 405 (quoting *Sunny Acres Villa, Inc. v. Cooper*, 25 P.3d 44, 47 (Colo. 2001)).

A party asserting the defense of issue preclusion must establish four elements:

(1) the issue sought to be precluded is identical to an issue actually and necessarily determined in a prior proceeding; (2) the party against whom estoppel is asserted was a party to or is in privity with a party to the prior proceeding; (3) there was a final judgment on the merits in the prior proceeding; and (4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding.

11

*Id.*  The party raising issue preclusion bears the burden of establishing its applicability.

*Bebo Constr. Co. v. Mattox & O'Brien, P.C.*, 990 P.2d 78, 85 (Colo. 1999).  "An issue is

actually litigated and necessarily adjudicated when a party properly raised the issue and

a determination on that issue was necessary to the judgment."  *Tonko*, 154 P.3d at 405.

Defendants argue that issue preclusion applies here because the issue of

probable cause was raised in a motion that was actually and necessarily determined in

the Boulder County suppression hearing; the party against whom defendants assert

issue preclusion, plaintiff, was the party in the previous proceeding; there was a final

judgment on the merits in the Boulder County case; and plaintiff was represented by

counsel and had a full opportunity to litigate the probable cause issue.  Docket No. 23

at 12–13.  There are, however, no facts, disputed or otherwise, concerning the probable

cause hearing, including what findings of fact or conclusions of law the judge made,

who testified at the hearing, what issues the court considered, or what the court actually

and necessarily determined.  Furthermore, there are no facts concerning a final

judgment or whether plaintiff, as the party against whom preclusion is being asserted,

had a full and fair opportunity to litigate the issue in the prior proceeding.[10]

### b.  Probable Cause

Because the Court has determined that issue preclusion does not bar the

---

[10] Defendants cite to an affidavit prepared by Thomas A. Carr, the City Attorney for the City of Boulder.  *See, e.g.*, Docket No. 23 at 6, ¶ 46 (citing Docket No. 23-1 at 2, ¶ 9).  While Mr. Carr's affidavit mentions a "trial minute order" from the Boulder County Court case, Docket No. 23-1 at 2, ¶ 8, defendants provide no facts regarding this order, and the order itself does not mention a probable cause motion or hearing.  *See* Docket No. 23-7.

relitigation of the probable cause issue, the Court turns to whether plaintiff's arrest or detention was supported by probable cause or reasonable suspicion, respectively.

"In a qualified immunity context, the probable cause evaluation is a question of law appropriate for resolution by the Court." *Shimomura v. Carlson*, 17 F. Supp. 3d 1120, 1132 (D. Colo. 2014) (citing *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (reversing a holding that the probable cause determination was a question for the trier of fact because "[i]mmunity ordinarily should be decided by the court long before trial")). In determining whether an officer has probable cause for an arrest, the Court is to "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (internal quotations marks and citation omitted). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)). Stated otherwise, "[p]robable cause is based on the totality of the circumstances, and requires reasonably trustworthy information that would lead a reasonable officer to believe that the person about to be arrested has committed or is about to commit a crime." *Cortez*, 478 F.3d at 1116. It is determined at the time of arrest, even if evidence later surfaces that eliminates probable cause. *Pierce v. Gilchrist*, 359 F.3d 1279, 1295 (10th Cir. 2004). Probable cause is not a high bar.

*Wesby*, 138 S. Ct. at 586.

"[W]hen a warrantless arrest or seizure is the subject of a § 1983 action, the defendant is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff." *Cortez*, 478 F.3d at 1120. Thus, in the Tenth Circuit, "[a]s a practical matter, in the context of a qualified immunity defense on an unlawful arrest claim, [courts] ascertain whether a defendant violated clearly established law by asking whether there was arguable probable cause for the challenged conduct." *Corona v. Aguilar*, 959 F.3d 1278, 1285 (10th Cir. 2020) (internal quotation marks and alterations omitted). "Arguable probable cause" is another way of saying that the officers' conclusions about whether probable cause existed rested on a reasonable but mistaken belief. *Cortez*, 478 F.3d at 1120–21. Therefore, the defendant officers are entitled to qualified immunity if they "*could* have reasonably believed that probable cause existed in light of well-established law." *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 879 (10th Cir. 2014) (citation omitted). "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Hunter*, 502 U.S. at 227 (quoting *Anderson*, 483 U.S. at 641). The relevant question in a probable cause analysis is whether a "substantial probability existed that the suspect committed the crime, requiring something more than a bare suspicion." *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011) (quotations and internal citations omitted). "Probable cause is not a precise quantum of evidence – it does not, for example, require the suspect's guilt to be more likely true than false. Instead, the relevant question is whether a substantial probability existed that the

14

suspect committed the crime, requiring something more than a bare suspicion."
*Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) (quotations and citations omitted).

The Colorado obstruction of a peace officer statute provides, in pertinent part:

> A person commits obstructing a peace officer . . . when, by using or threatening to use violence, force, physical interference, or an obstacle, such person knowingly obstructs, impairs, or hinders the enforcement of the penal law or the preservation of the peace by a peace officer, acting under color of his or her official authority.

Colo. Rev. Stat. § 18-8-104(1)(a).

Defendants argue that there was probable cause to arrest plaintiff because plaintiff refused to identify herself, ignored repeated requests to sit down, and twice reached into a bag after being told not to. Docket No. 23 at 10. Defendants rely on *Dempsey v. People*, 117 P.3d 800 (Colo. 2005), which has been cited by the Tenth Circuit. *See, e.g.*, *Kaufman v. Higgs*, 697 F.3d 1297, 1302 (10th Cir. 2012) (looking to *Dempsey* when interpreting Colorado's criminal obstruction statute in a qualified immunity context). In *Dempsey*, the Colorado Supreme Court held that, "although mere verbal opposition alone may not suffice, a combination of statements and acts by the defendant, including threats of physical interference or interposition of an obstacle can form the crime of obstruction." *Dempsey*, 117 P.3d at 811. Plaintiff attempts to distinguish *Dempsey* because, she argues, *Dempsey* involved an individual who "expressly refused to identify" himself and walked away from the officers, while plaintiff provided her birthdate to Officer Lolotai and he called her by her name, indicating that he knew who she was, and never walked away. Docket No. 26 at 4. While the facts of

15

*Dempsey* are not identical to the facts of this case, plaintiff misstates *Dempsey*'s

holding, which is that remonstration alone cannot suffice for a showing of obstruction.

Additionally, other courts have applied the rule in *Dempsey* in different factual

scenarios.  For instance, the court in *Garife v. Schuster*, No. 17-cv-02312-MSK-SKC,

2019 WL 3425234, at *8 (D. Colo. July 30, 2019), considered *Dempsey* and issues of

probable cause in context of the obstruction statute.  In denying the defendants' motion

for summary judgment, the court held that, where the plaintiff "simply stood up, moved

a few feet, and sat back down next to the driver" and where "[t]here [wa]s no evidence

that this movement interfered with or obstructed the search of the vehicle," the officers

did not have probable cause to arrest the plaintiff for obstruction.  *Garife*, 2019 WL

3425324, at *8; *cf. Holdridge v. Blank*, 255 F. Supp. 3d 1088, 1096 (D. Colo. 2017)

(applying *Dempsey* and finding probable cause for obstruction arrest where undisputed

facts established that the "plaintiff advanced towards [the officer] in an agitated manner,

refused to comply with the officer's orders to stop, continued walking towards [the

officer], and then taunted the officer").  Unlike in *Garife*, however, the undisputed facts

in this case indicate that plaintiff was repeatedly instructed to sit down and stop

reaching in her bag, yet she did not comply with these lawful orders.  Docket No. 23 at

3–4, ¶¶ 14–16, 22–25.  The undisputed facts also establish that Officer Lolotai

attempted to gain plaintiff's compliance by stating that she was being detained and

threatening her with handcuffs if she did not stop disobeying their commands.  *Id.* at 4,

¶¶ 19, 21.  The facts also indicate that Officer Lolotai ordered plaintiff to sit in order to

ensue his safety.  *Id.* at 3, ¶ 16.  *See Lord v. Hall*, 520 F. App'x 687, 692 (10th Cir.

2013) (unpublished) (finding probable cause for obstruction where plaintiff "disobeyed orders, resisted attempts to be handcuffed, and struggled with the officers on the ground").  While plaintiff provided her birthdate and at least Officer Lolotai seems to have known who she was, this is not sufficient to create a genuine issue of material fact as to whether the officers had probable cause to believe that she obstructed their duties.

Plaintiff relies on her acquittal for the obstruction charge in state court.  She argues that the defendants' argument "that a reasonable jury could not ever . . . disagree with their version of events" is incorrect "because a reasonable jury did in fact acquit Michele Rodriguez for obstructing a peace officer."  Docket No. 26 at 3. Plaintiff's reliance is misplaced for two reasons.  First, plaintiff provides no facts to support this assertion.  Instead, she cites to her complaint, yet a complaint can only be treated as an affidavit for purposes of summary judgment if it complies with the standards for affidavits in Rule 56.  *See Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1988) (complaint must be based on personal knowledge, contain facts which would be admissible at trial, and show that the affiant is competent to testify on the matters stated therein).  Unlike in *Conaway*, where the plaintiff provided factual allegations and documentary evidence, including photos, *id.*, plaintiff's complaint does not meet these requirements.  Second, probable cause is determined at the time of the arrest, not at the time of trial, and can justify an arrest even if the arrestee is later not found guilty. *See Pierce*, 359 F.3d at 1295; *Kerns*, 663 F.3d at 1188 (probable cause "does not require proof beyond reasonable doubt" or "the suspect's guilt to be 'more likely true than false'" (quoting *Texas v. Brown*, 460 U.S. 730, 742 502 (1983)).  Thus, the

17

question is not whether plaintiff actually obstructed justice, but whether there was probable cause for the officers to think that she had, even if they were ultimately incorrect.[11]

Moreover, because probable cause is measured by an objective standard, "an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking." *Mglej v. Gardner*, 974 F.3d 1151, 1161 (10th Cir. 2020) (quoting *Wesby*, 138 S. Ct. at 584 n.2). Here, the undisputed facts indicate that the officers found plaintiff in the park after the park was closed – against Boulder's municipal rules – and, when they arrived, they found several open containers scattered in the area where plaintiff and the individuals were congregating, including within easy reach of plaintiff and immediately behind her. Docket No. 23 at 2–3, ¶¶ 4–6, 10, 12–13. There was, therefore, at least probable cause for the officers to believe that plaintiff had violated Boulder's municipal rule on park closure and arguable probable cause that she possessed an open container of alcohol. Even if the officers' belief about plaintiff's possession of an open container turned out to be erroneous, the arrest was supported by probable cause. *See Cortez*, 478 F.3d at 1120 (explaining that arguable probable cause is another way of saying that the officers' conclusions about whether probable cause existed rested on a reasonable but mistaken belief); *Lord*, 520

---

[11] Plaintiff also claims that the officers lied about the events leading up to her arrest. Docket No. 26 at 5. However, she offers no facts to support this proposition, and an officer may generally approach an individual and ask questions without implicating the Fourth Amendment. *See United States v. Rogers*, 556 F.3d 1130, 1138 (10th Cir. 2009) (citing *Florida v. Bostick*, 501 U.S. 429, 434–35 (1991) ("even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual")).

F. App'x at 691 ("[T]he qualified immunity standard allows for mistaken judgments based upon a mistake of fact, mistake of law or a mistake based upon a combination of the two, so long as the mistake is objectively reasonable." (citing *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009)); *cf. Shimomura*, 17 F. Supp. 3d at 1132 ("In a qualified immunity context, the probable cause evaluation is a question of law appropriate for resolution by the Court.").[12]

The Court does not reach the issue of whether the alleged constitutional violation was clearly established at the time of plaintiff's arrest because, for a plaintiff to prevail against a qualified immunity defense, both prongs – a constitutional violation of a clearly established right – must be adequately established; however, for a defendant to prevail, inadequacy with respect to either prong will suffice.  *See Shroff*, 604 F.3d at 1188.  Because the Court finds that the officers are entitled to qualified immunity on the first claim, the Court will enter summary judgment in their favor.  *See, e.g.*, *Holdridge*, 255 F. Supp. 3d at 1095.

### 2. Claim Two – Unreasonable and Excessive Use of Force

The Court next considers plaintiff's excessive force claim.  "To state a claim of excessive force under the Fourth Amendment, a plaintiff must show both that a seizure occurred and that the seizure was unreasonable."  *Bella v. Chamberlain*, 24 F.3d 1251, 1255 (10th Cir. 1994) (quotation omitted).  The relevant inquiry is whether the force used by the officers was "reasonable under the facts and circumstances presented."

---

[12] Because the undisputed facts indicate that the officers had probable cause to arrest plaintiff, the Court need not determine whether the officers also had reasonable suspicion to detain her, as probable cause requires a higher showing.

*See Fogarty v. Gallegos*, 523 F.3d 1147, 1159 (10th Cir. 2008) (citing *Graham v. Connor*, 490 U.S. 386, 396, 109 (1989)).  Thus, when examining a claim of excessive force, "[a] court assesses the reasonableness of an officer's conduct from the perspective of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances."  *Buck v. City of Albuquerque*, 549 F.3d 1269, 1287-88 (10th Cir. 2008) (quoting *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1220 (10th Cir. 2005)).

In her complaint, plaintiff states that she "did [not] pose a threat to anybody's safety or attempt to flea [sic] from officers" and that she was only restrained "after she stated that she needed protection" from the officers.  Docket No. 1 at 16, ¶¶ 54–55.  She also states that she did not attempt to resist the officers when they "reached to put her in handcuffs but nevertheless inflicted serious pain on her when they slammed her to the ground, put a knee in her back and neck, and twisted her arms and shoulders . . . caus[ing] . . . pain and bruising."  *Id.*, ¶ 58.  The undisputed facts, however, paint a different picture.  The facts establish that the officers asked plaintiff to sit down 11 times for their safety.  Docket No. 23 at 3, ¶¶ 14, 16.  Officer Lolotai attempted to obtain plaintiff's compliance with his request that she stay seated by stating that he was detaining her and threatening her with handcuffs if she did not obey his orders.  *Id.* at 4, ¶¶ 19, 21.  Undeterred, plaintiff reached into her bag or backpack, even though she was warned more than once not to.  *Id.*, ¶¶ 22–23, 25–26.  Plaintiff continued to resist the officers as they attempted to handcuff her.  *Id.*, ¶¶ 27–28.  The officers bent plaintiff over, with her face on a bag for 62 seconds, before she was helped up and allowed to

move about.  *Id.* at 5, ¶¶ 29–32.  She continued to disobey their requests that she stay seated.  *Id.*, ¶ 32.

In evaluating the reasonableness of the force used during a seizure, courts consider factors including "the severity of the crime at issue, whether the suspect poses an immediate threat to safety of the officers and others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.

Considering the first *Graham* factor, the severity of the crime at issue, plaintiff was arrested for a relatively minor offense, obstruction of a peace officer, which is a Class 2 misdemeanor.  *See* Colo. Rev. Stat. § 18-8-104(4).  This weighs against the use of significant force.  *See Perea v. Baca*, 817 F.3d 1198, 1203 (10th Cir. 2016) ("[a] minor offense – at most – support[s] the use of minimal force.").  The second *Graham* factor, whether the suspect poses an immediate threat to the safety of the officers and others, is inconclusive.  The undisputed facts indicate that plaintiff had been repeatedly warned not to reach into her bag, and the officers asked plaintiff and the others to sit to ensure their safety.  *See Novitsky v. City of Aurora*, 491 F.3d 1244, 1254 (10th Cir. 2007) (officers may use force to "protect their personal safety").  However, a reasonable jury could find that plaintiff posed no more than a minor threat to the officers' safety.  On summary judgment, therefore, the Court may not draw an inference that plaintiff posed an immediate threat to the safety of the officers or others.  The third and final *Graham* factor, whether the individual is actively resisting arrest, considered together with the other two factors supports the officers' use of at least minimal force to effectuate the arrest.  The undisputed facts establish that plaintiff did not comply with

the officers' orders and that she resisted them.  *See, e.g.*, Docket No. 23 at 5, ¶ 30; *see also Graham*, 490 U.S. at 396 ("[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."); *cf. Sexton v. City of Colo. Springs*, No. 20-cv-00108-PAB-KMT, 2021 WL 1210375, at *9 (D. Colo. Mar. 31, 2021) (finding officer entitled to use minimal force in arrest of plaintiff, who did not actively resist, for violation minor municipal ordinance).

Plaintiff cites to two cases to support the proposition that the use of force against her was unreasonable.  Docket No. 26 at 8–11.  The Court finds that these cases are either distinguishable or, in fact, support the amount of force that the officers used to restrain her.  In *Plascencia v. Taylor*, 514 F. App'x 711, 716 (10th Cir. 2013) (unpublished), the court held that a jury could have found the officer's use of "several forceful techniques," including "repeatedly lifting [the plaintiff's] arms behind his back and repeatedly striking [his] legs, . . . without any objectively reasonable safety concerns."  Here, the undisputed facts, including Officer Her's body worn camera footage, shows that the officers bent plaintiff over onto the ground in order to handcuff her and that, after they were able to apply the handcuffs, they stood her up and allowed her to move freely.  *See* Docket No. 23 at 5, ¶ 32; *see also* Docket No. 25, (Ex. C) (Her) AXON_Body_2_Video_2018-08-25_2338, at 5:41:14–45:13.  No reasonable jury could find the use of force in this case to be comparable with the force in *Plascencia*.  Nor could a jury find, for instance, that plaintiffs' handcuffs were applied too tight, as there is no indication that plaintiff complained about them.[13]  Furthermore, while plaintiff argues

---

[13] "In some circumstances, unduly tight handcuffing can constitute excessive force where a plaintiff alleges some actual injury from the handcuffing and alleges that

that, if the officers were concerned for their safety, they would have handcuffed her "immediately rather than in response to [plaintiff] beginning to call their supervising sergeant," Docket No. 26 at 10, the undisputed facts indicate that Office Lolotai attempted to warn plaintiff that she would be handcuffed if she did not sit down and refrain from reaching in her bag.  *See* Docket No. 23 at 4, ¶ 21.

Plaintiff also cites to *Smith v. Kenny*, 678 F. Supp. 2d 1124, 1162 (D.N.M. 2009), a non-binding case, where the court discussed the appropriateness of the use of handcuffs in an unlawful arrest.  Here, however, the officers had probable cause to arrest plaintiff, which makes *Smith* distinguishable.  Additionally, in *Smith*, the court granted a defendant officer's excessive force claim because the plaintiffs did not "allege non-*de minimis* physical or emotional injury."  *Id.* at 1165–66.  Here, plaintiff has only alleged at most a *de minimis* injury.  Therefore, even if *Smith* were binding authority, it would be inapposite to the facts of this case and would not support plaintiff's excessive force claim.

Additionally, plaintiff argues that the officers were not entitled to use the force

---

an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight."  *Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007).  However, "[t]o recover on [a] handcuffing claim, [a plaintiff] must show both that the force used was more than reasonably necessary and 'some actual injury caused by the unreasonable seizure that is not *de minimis*, be it physical or emotional.'"  *Fisher v. City of Las Cruces*, 584 F.3d 888, 897 (10th Cir. 2009) (quoting *Cortez*, 478 F.3d at 1129 n.25).  The Tenth Circuit has subsequently clarified that the *de minimis* injury requirement only applies in handcuffing cases.  *See United States v. Rodella*, 804 F.3d 1317, 1327-29 (10th Cir. 2015) (stating that there is no *de minimis* injury requirement for excessive force claims that involve more than handcuffing).  Nevertheless, because the Court finds that no reasonable jury could find that the officers' use of force was unreasonable, the Court need not resolve whether plaintiff was required to assert facts that show a more than *de minimis* injury.

that they applied because less severe force could have addressed the obstruction charge.  Docket No. 26 at 11.  As explained above, the undisputed facts indicate that Officer Lolotai attempted to warn plaintiff that she would be handcuffed if she did not comply.  Docket No. 23 at 4, ¶ 21; *see also Holdridge*, 255 F. Supp. 3d at 1095 (noting that officer attempted to de-escalate the situation by warning plaintiff that officer would detain plaintiff if plaintiff "could not abide").

It is well established that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," *Graham*, 490 U.S. at 396, and handcuffing is appropriate in nearly every situation where an arrest is authorized.  *Fisher*, 584 F.3d at 896–97.  Furthermore, the Tenth Circuit has permitted officers to use some degree of force even in *Terry* stops.  *See Perdue*, 8 F.3d at 1463 (citing *United States v. Hemphill*, 767 F.2d 922 (6th Cir. 1985) (Table) (requiring suspects to lie on ground in handcuffs); *United States v. Kapperman*, 764 F.2d 786, 790 n.4 (11th Cir. 1985) (placing suspect in police car in handcuffs); *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983) (making suspect lie on ground in handcuffs)).  The permissible use of force in these cases, where the officers only had reasonable suspicion to detain the suspect, indicate that no jury could find the officers' use of force in this case to be unreasonable.[14]

The Court finally addresses plaintiff's claim that the use of Haldol was excessive and unnecessary.  Docket No. 1 at 16, ¶ 59.  The undisputed facts indicate that the

---

[14] While plaintiff claims that the officers slammed her to the ground, *see, e.g.*, Docket No. 26 at 15, she provides no facts to support this assertion, and the record evidence contradicts her statement.

paramedics, who responded to non-party officers' request that plaintiff be transported via ambulance to a hospital, made the decision to administer Haldol over the objection of an officer.  Docket No. 23 at 6, ¶¶ 41–42; Docket No. 25, (Ex. E) (Ekwo) AXON_Body_2_Video_2018-08-25_2345, at 5:55:22–41.  There are no facts – disputed or undisputed – indicating that Officers Lolotai or Her were involved in any way in the decision to administer Haldol.  The Court therefore finds that the defendant officers are entitled to summary judgment on plaintiff's excessive force claim because plaintiff has not established a genuine dispute of material fact regarding her excessive force claim and, thus, there is no constitutional violation.  As with plaintiff's seizure claim, the Court need not consider the clearly-established prong of the qualified immunity analysis.

### 3.  Claim Three – Unlawful Suppression of Speech and Infringement on Association

Plaintiff's third claim is that the officers violated her First Amendment rights when they arrested her not because she committed a crime but because she "was houseless in public" and questioned the officers.  Docket No. 1 at 17, ¶ 64.  She also claims in her complaint that she was "arrested and retaliated against for engaging in free speech and protesting government actions," *i.e.*, "the actions of Lolotai and officer Her."  *Id.*, ¶ 65.  Finally, she asserts that the "illegal arrest was a message . . . [that] houseless individuals do not have the right to associate with anybody, for any reason, in Boulder." *Id.* at 17–18, ¶ 66.  The Court construes plaintiff's claim as alleging that the officers (1) retaliated against her for being houseless and for questioning them and (2) violated her right to associate with other houseless people.

25

### a. First Amendment Retaliation Claim

Generally, "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech."  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (internal quotation marks omitted).  To establish a First Amendment retaliation claim, plaintiff must demonstrate (1) that he was engaged in a constitutionally protected activity; (2) that the defendant's action caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's action was substantially motivated as a response to his exercise of his First Amendment speech rights.  *Becker v. Kroll*, 494 F.3d 904, 925 (10th Cir. 2007).

The officers are entitled to summary judgment on this claim, however, because, in order to prove a First Amendment retaliation claim, a plaintiff must plead and prove the absence of probable cause for the arrest.  *Id.* (citing *Hartman v. Moore*, 547 U.S. 250, 265–66 (2006) ("Because showing an absence of probable cause will have high probative force, and can be made mandatory with little or no added cost, it makes sense to require such a showing as an element of a plaintiff's case, and we hold that it must be pleaded and proven.")); *see also Nieves*, 139 S. Ct. at 1723 ("[P]laintiffs in retaliatory prosecution cases to show more than the subjective animus of an officer and a subsequent injury; plaintiffs must also prove as a threshold matter that the decision to press charges was objectively unreasonable because it was not supported by probable cause.").  Plaintiff does not challenge the rule in *Nieves* in her response to defendants' summary judgment motion or mention the First Amendment at all, except in passing to

note that "Michele Rodriguez's complaint alleges she was illegally (i.e. unreasonably) seized due to a lack of reasonable suspicion, probable cause and with excessive force all under the Fourth Amendment along with a violation of free speech under the First Amendment; thus constitutional violations have been alleged."  Docket No. 26 at 8. This conclusory statement cannot serve to preclude summary judgment on this claim for defendants.  *See, e.g.*, *Valdez v. New Mexico*, 109 F. App'x 257, 263 n.4 (10th Cir. 2004) (unpublished) (concluding that the plaintiff had "not stated a First Amendment claim in any context" where the court could "discern no distinction" between the plaintiff's First Amendment retaliation claim and his claim alleging a direct denial of his First Amendment rights).[15]

### b.  First Amendment Association Claim

The First Amendment provides that "Congress shall make no law . . . prohibiting . . . the right of the people peaceably to assemble, and petition the Government for a

---

[15] To the extent plaintiff's First Amendment claim is that she faced a content-based restriction in the form of a prohibition on her being "houseless in public" or that the officers' arrest of plaintiff was a message to other homeless people, she does not identify a court order that operated as a prior restraint on the exercise of her First Amendment rights, *see, e.g.*, *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (addressing the constitutionality of an injunction preventing the New York Times and the Washington Post from publishing the contents of a classified study), challenge a specific law, regulation, or policy restricting her ability to speak, *see, e.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155 (2015) (holding that city ordinance regulating the display of outdoor signs violated the First Amendment); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 264–65 (1964) (holding that state libel laws violated the First and Fourteenth Amendments); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) (characterizing issue as "whether a policy of compelling public employees to take a leave of absence if they want to run for public office is sufficiently important to the effective functioning of state (or, as here, city) government to justify the impairment of freedom of speech that may result"), or seek to use the First Amendment as a defense to tort liability.  *See, e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 459–60 (2011) (holding that church was not subject to tort liability for protected speech under the First Amendment).

redress of grievances." U.S. Const. amend. I. The Supreme Court has recognized "a First Amendment right to associate for the purpose of speaking, which [it has] termed a 'right of expressive association.'" *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 68 (2006) (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 644 (2000)); *see also Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 658 (10th Cir. 2006) ("In addition to freedom of speech, the First Amendment also implicitly protects the corresponding freedom to expressive association."). The First Amendment protects associational rights in two ways: (i) it "protects against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships"; and (ii) it ensures "the freedom of individuals to associate for the purpose of engaging in protected speech or religious activities." *Bd. of Dirs. v. Rotary Club of Duarte*, 481 U.S. 537, 544 (1987); *Grace United Methodist Church*, 451 F.3d at 658. There is, therefore, no independent right of association unless the association is expressive. *See City of Dallas v. Stanglin*, 490 U.S. 19, 23 (1989) (declined to extend First Amendment protection to "dance halls" because "they simply do not involve the sort of expressive association that the First Amendment has been held to protect" and "there [was] no suggestion that these patrons 'take positions on public questions'").

Defendants do not address plaintiff's associational allegations in their motion for summary judgment, and plaintiff does not raise them in response. *See generally* Docket Nos. 23, 26. There are also no facts, disputed or undisputed, establishing that plaintiff was engaging in the sort of expressive First Amendment associational activity

that would be protected.  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618–622 (1984) ("The right to associate for expressive purposes is not, however, absolute"; courts only "recognize[] a right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion"); *Stanglin*, 490 U.S. at 24 ("there is no generalized right of free association").  Therefore, even construing the facts in the light most favorable to plaintiff, plaintiff has not demonstrated a material issue of disputed fact regarding her association claim, and defendants are entitled to summary judgment.

### B.  Claims Against City of Boulder

Plaintiff's fourth claim is that the City was negligent in hiring and retaining Officer Lolotai and failed to adequately train, supervise, and discipline him.  Docket No. 1 at 18–21, ¶¶ 70–82.  Her fifth claim is that Boulder has an unconstitutional policy, practice, or custom of allowing the use of excessive force, perjury, and false arrests in violation of constitutional rights.  *Id.* at 21–22, ¶¶ 83–89.[16]

Local governments may not be sued under 42 U.S.C. § 1983 on a theory of

---

[16] Defendants argue that the Court lacks subject matter jurisdiction over plaintiff's negligent hiring or supervision claim for two reasons.  Docket No. 23 at 16–17.  First, defendants characterize this claim as a state-law claim and argue that the Court lacks supplemental jurisdiction over it because it does not arise out of the same "case or controversy" or "common nucleus of operative fact" as plaintiff's federal law claims, since Officer Lolotai's hiring in 2016 could not have made it "plainly obvious" to the City that a constitutional violation would result.  *Id.* at 17.  Second, defendants argue that, because she did not file a notice with the City, any state law claim barred by the Colorado Governmental Immunity Act ("CGIA").  *Id.*  Defendants, however, appear to concede that plaintiff has stated only federal law claims.  Docket No. 29 at 9 ("Plaintiff has made clear that she is not asserting claims under state law.").  The Court therefore will not consider defendants' arguments that the Court lacks subject matter jurisdiction over plaintiff's negligent hiring or supervision claim.

*respondeat superior*.  *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 692 (1978).

Instead, local governing bodies can be sued directly only where "the action that is

alleged to be unconstitutional implements or executes a policy statement, ordinance,

regulation, or decision officially adopted and promulgated by that body's officers."  *Id.* at

690 (footnote omitted).  "[I]t is when execution of a government's policy or custom,

whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent official policy, inflicts the injury that the government as an entity is responsible

under § 1983."  *Id.* at 694.  In order to state a claim for municipal liability under § 1983

for the actions of a municipal employee, a party must allege sufficient facts to

demonstrate that it is plausible (1) that the municipal employee committed a

constitutional violation; and (2) that a municipal policy or custom was the moving force

behind the constitutional deprivation.  *Jiron*, 392 F.3d at 419.

A municipality cannot be held liable under § 1983 for the allegedly

unconstitutional actions of its employees if those actions were not in fact

unconstitutional.  *See Trigalet v. City of Tulsa*, 239 F.3d 1150, 1154 (10th Cir. 2001);

*see also Webber v. Mefford*, 43 F.3d 1340, 1344–45 (10th Cir. 1994) ("A claim of

inadequate training, supervision, and policies under § 1983 cannot be made out against

a supervisory authority absent a finding of a constitutional violation by the person

supervised.").  Because the individual officers are entitled to summary judgment on all

claims asserted against them, the City is likewise entitled to summary judgment on the

claims asserted against it.  *See Trigalet*, 239 F.3d at 1155–56 ("Thus, even if it could be

said that Tulsa's policies, training, and supervision were unconstitutional, the City

cannot be held liable where, as here, the officers did not commit a constitutional violation."); *see also Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997) (holding that a plaintiff show direct causal link between municipal action and deprivation of federal rights in order to hold municipality liable under § 1983); *Jiron*, 392 F.3d at 419 n.8 ("[W]hen a finding of qualified immunity is based on a conclusion that the officer has committed no constitutional violation – *i.e.*, the first step of the qualified immunity analysis – a finding of qualified immunity does preclude the imposition of municipal liability."); *Holdridge*, 255 F. Supp. 3d at 1098–99 (granting city's motion for summary judgment on claims of failure to train and policies or customs resulting in illegal seizure of plaintiff, excessive force, unlawful arrest because there was no constitutional violation after the individual officer was granted summary judgment).

Moreover, even if plaintiff had established a genuine dispute of material fact so as to preclude summary judgment on her claims against the individual officers, her failure-to-train claim would not survive.  To state a *Monell* claim based on the failure to train or supervise, a plaintiff must sufficiently allege that the failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Okla. City v. Tuttle*, 471 U.S. 808, 822–823 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional

violation, than was the policy in *Monell*.").  Plaintiff provides no facts providing a basis

for her failure-to-train theory, yet notice of particular deficiencies in a training program is

the crux of a failure-to-train theory because "[w]ithout notice that a course of training is

deficient in a particular respect, decisionmakers can hardly be said to have deliberately

chosen a training program that will cause violations of constitutional rights."  *Connick*,

563 U.S. at 62; *see also Erickson v. City of Lakewood*, 489 F. Supp. 3d 1192, 1208 (D.

Colo. 2020) (dismissing Monell claim where plaintiff failed to allege specific facts

regarding the officers' training, did not identify individuals that allegedly failed to

adequately supervise or train, and did not contain allegations establishing a pattern of

similar conduct)*; Bark v. Chacon*, No. 10-cv-01570-WYD-MJW, 2011 WL 1884691, at

*3 (D. Colo. May 18, 2011) (dismissing municipal liability claim where plaintiff had

"generally allege[d]" that the individual defendants were not properly trained but had not

"allege[d] specific deficiencies in training and supervision, or explain[ed] how the

incident described in the Amended Complaint could have been avoided with different or

better training and supervision").  Nor may a plaintiff attempt to fasten liability onto a city

because "a particular officer may be unsatisfactorily trained."  *Harris*, 489 U.S. at 390

(noting that a showing of deliberate indifference is necessary in Section 1983

failure-to-train cases, because "[i]t may be, for example, that an otherwise sound

program has occasionally been negligently administered. . . .  Such a claim could be

made about almost any encounter resulting in injury, yet not condemn the adequacy of

the program to enable officers to respond properly to the usual and recurring situations

with which they must deal. And plainly, adequately trained officers occasionally make

mistakes; the fact that they do says little about the training program or the legal basis

for holding the city liable.")).

Additionally, even if plaintiff had established a genuine dispute of material fact on her negligent hiring claim, the claim would fail because, for such a claim, a plaintiff must "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404. Unlike failure to train, where "a pattern of tortious conduct by inadequately trained employees" may establish the "deliberate indifference necessary to trigger municipal liability," *id.* at 407 (quotation omitted), it is particularly difficult for a single hiring decision to give rise to the necessary fault and causation to impose § 1983 liability on a municipality. *Id.* at 410–11. And a plaintiff may not maintain a § 1983 claim based on negligence, which underlies plaintiff's negligent hiring claim. *See Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997) (considering allegations of negligent conduct in context of liability against prison warden); *see also Holmstrom v. Bd. of Cnty. Comm'rs for Cnty. of Chaves*, 181 F. Supp. 3d 862, 880 (D.N.M. 2016).

**C. Claims Against Paramedics**

The Court finally considers plaintiff's claims against the defendant John Doe paramedics and their employer (the "paramedic defendants") *sua sponte* due to plaintiff's failure to demonstrate service upon them. Federal Rule of Civil Procedure 4(m) provides, in pertinent part,

> If a defendant is not served within 90 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against that defendant or order that service be made within a specified time.

Plaintiff initiated this action on August 24, 2020, Docket No. 1, and provided a

summons request for Officer Lolotai, Officer Her, the City, and the Boulder District Attorney's Office.  *See* Docket Nos. 1-2, 1-3, 1-4.  (The Boulder District Attorney's Office was voluntarily dismissed on October 23, 2020.  Docket No. 18.)  She did not provide a summons request for the paramedic defendants, and there is no indication that these defendants have been served with the complaint.   Plaintiff's failure to effectuate proper service on the paramedic defendants within the time limits prescribed by Rule 4(m) is grounds for dismissal of her claims against them in the absence of justification for the failure.  *See Jones v. Frank*, 973 F.2d 872, 873–74 (10th Cir. 1992).  The Court will therefore order plaintiff to show cause why the claims against the paramedic defendants should not be dismissed pursuant to Rule 4(m).

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Combined Motion for Summary Judgment on Behalf of Officers Lolotai, Her, and the City of Boulder [Docket No. 23] is **GRANTED**.  It is further

**ORDERED** that plaintiff's first, second, and third claims against the individual officer defendants are **DISMISSED with prejudice**.  It is further

**ORDERED** that plaintiff's fourth and fifth claims against the City of Boulder are **DISMISSED with prejudice**.  It is further

**ORDERED** that plaintiff shall show cause on or before **April 20, 2022** why plaintiff's third claim against the John Doe paramedics and their employer should not be dismissed without prejudice.

DATED March 28, 2022.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge